**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCAP-22-0000557
28-AUG-2024
12:35 PM
Dkt. 38 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

WILLIE KAUPIKO; KA'IMI KAUPIKO; MIKE NAKACHI; FOR THE FISHES;
CENTER FOR BIOLOGICAL DIVERSITY; and KAI PALAOA,
Plaintiffs-Appellants/Cross-Appellees,

vs.

BOARD OF LAND AND NATURAL RESOURCES, STATE OF HAWAI'I; and
DEPARTMENT OF LAND AND NATURAL RESOURCES, STATE OF HAWAI'I,
Defendants-Appellees/Cross-Appellants,

and

PET INDUSTRY JOINT ADVISORY COUNCIL,
Defendant-Intervenor-Appellee/Cross-Appellee.

SCAP-22-0000557

APPEAL FROM THE ENVIRONMENTAL COURT OF THE FIRST CIRCUIT
(CAAP-22-0000557; CASE NO. 1CCV-21-0000892)

AUGUST 28, 2024

RECKTENWALD, C.J., AND EDDINS, JJ., AND
CIRCUIT JUDGE TONAKI AND CIRCUIT JUDGE PARK,
ASSIGNED BY REASON OF VACANCIES,
WITH McKENNA, J., CONCURRING IN PART AND DISSENTING IN PART

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.  INTRODUCTION

This case concerns environmental review of commercial aquarium fishing permits.  In 2017, this court ruled in Umberger v. Dep't of Land & Nat. Res., 140 Hawai'i 500, 403 P.3d 277 (2017) that the commercial aquarium collection permitting process is subject to environmental review under the Hawai'i Environmental Policy Act (HEPA).  We held that commercial aquarium collection is not exempt from HEPA review because, as a matter of law, "a permit for extraction of an unlimited number of aquatic life cannot be said to constitute only a 'minor alteration' in the condition of State waters and submerged lands."  Id. at 525, 403 P.3d at 302 (quoting Hawai'i Administrative Rules (HAR) § 11-200-8(a)(4) (2018) (repealed 2019)) (brackets and footnote omitted).  On remand, the environmental court issued an order voiding all existing commercial aquarium permits issued pursuant to Hawai'i Revised Statutes (HRS) § 188-31 (2011) and enjoining the Hawai'i Department of Land and Natural Resources (DLNR) from issuing or renewing further permits without completion of HEPA review.

After the Umberger injunction, the Pet Industry Joint Advisory Council (PIJAC) prepared an environmental impact statement (EIS) in pursuit of permits to continue commercial aquarium fishing in the West Hawai'i Reef Fishery Management Area

2

(WHRFMA).  The Board of Land and Natural Resources (BLNR or the State) initially rejected the EIS for fourteen reasons.  PIJAC revised the EIS and published it.  During the mandatory public comment period, the EIS received extensive feedback, including from the plaintiffs-appellants in this case.  PIJAC then submitted the final EIS to BLNR.  After another hearing, BLNR voted 3-3 because the seventh member of the Board was absent, and the revised final EIS (RFEIS) was "deemed to be accepted" by operation of law.  See HRS § 343-5(e) (2022).

Plaintiffs sued BLNR in the Environmental Court for the First Circuit, seeking declaratory and injunctive relief concerning the default acceptance of the RFEIS.  The environmental court ruled against Plaintiffs, finding that, under the "rule of reason," the EIS adequately disclosed facts so that the agency could render an informed decision.  Plaintiffs appealed and applied for transfer, which we accepted.  Separately, the State cross-appealed from the environmental court's denial of its motion to dismiss.  The State argues that the 3-3 vote does not constitute state action and accordingly, it should not be charged with defending the EIS.

We hold that (1) the State is a proper defendant to the case and should defend the EIS; (2) a reviewing court should consider the "rule of reason" in conjunction with HEPA's content requirements in evaluating an EIS; and (3) the EIS here was

legally sufficient because it both met HEPA's content requirements and contained information sufficient for BLNR to make an informed decision.  We therefore affirm the environmental court's denial of the State's motion to dismiss and its grant of summary judgment for PIJAC.

## II.  BACKGROUND

To improve the management of fishing and fishery resources in Hawai'i, the legislature created the WHRFMA through Act 306 in 1998.  See 1998 Haw. Sess. Laws Act 306, § 1 at 985-86.  In doing so, it "recognize[d] the scientific support for establishing fish replenishment areas where no fishing is allowed as an effective means to enhance stocks of sport fish and food fish."  Id. at 986.  The Act directed DLNR to set aside at least thirty percent of the West Hawai'i coastline as fish replenishment areas (FRAs) where aquarium fish collecting is prohibited.  Id.  Commercial collectors can seek permits to fish in the WHRFMA from the DLNR pursuant to HRS § 188-31 and its associated administrative rules.  See Umberger, 140 Hawai'i at 504, 403 P.3d at 281.

In 2017, this court held in Umberger that HRS § 188-31's commercial aquarium collection permitting process is subject to environmental review under HEPA.  Id. at 528, 403 P.3d at 305.  Aquarium collection is not exempt from HEPA review because, as a matter of law, "a permit for extraction of an

4

unlimited number of aquatic life cannot be said to constitute only a 'minor alteration' in the condition of State waters and submerged land."  Id. at 525, 403 P.3d at 302 (quoting Hawai'i Administrative Rules (HAR) § 11-200-8(a)(4) (2018) (repealed 2019)) (brackets and footnote omitted).  On remand, the environmental court issued an order voiding all existing commercial aquarium permits issued pursuant to HRS § 188-31 across the state and enjoining DLNR from issuing or renewing further permits without completion of HEPA review.

HRS § 343-2 (2010) defines an EIS as,

> an informational document prepared in compliance with the rules adopted under section 343-6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

Broadly, an applicant seeking to carry out an "action" under HRS § 343-5 (2010) must engage in environmental review — either an environmental assessment or an EIS.[1]  HAR § 11-200-1 (2018)[2] explained that HRS Chapter 343

> establishes a system of environmental review at the state and county levels which shall ensure that environmental

---

[1]    The type of environmental review at issue here is an EIS. Environmental assessments, which are a different type of review, are therefore not discussed further.

[2]    HAR § 11-200 was replaced with HAR § 11-200.1 in 2019.  HAR § 11-200 (2018) is applicable because the EIS was published in 2018, before the new rules were adopted.  In any event, the relevant rules are substantively much the same.

concerns are given appropriate consideration in decision making along with economic and technical considerations. The purpose of this chapter is to provide agencies and persons with procedures, specifications of contents of environmental assessments and environmental impact statements, and criteria and definitions of statewide application.

HAR § 11-200-17 (2018) (now codified at HAR § 11-200.1-24) contained the content requirements for an EIS, which includes a description of the action, significant beneficial and adverse impacts, proposed mitigation measure, alternatives considered, and unresolved issues, and amongst several other requirements. HAR § 11-200-23 (2018) (repealed 2019) provided the rule for the acceptability of an EIS. An EIS is reviewed by a government agency — in this case, BLNR — which may or may not accept the EIS. See HRS § 343-5(e). If the agency denies the EIS, it can provide reasons for doing so and the applicant can submit a revised EIS. See id., HAR § 11-200-23(e) (2018) (repealed 2019).

On appeal, courts use "rule of reason" analysis to review an accepted EIS:

> In reviewing a challenge to an accepted EIS, this court "uses the 'rule of reason' to determine whether an EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision." Citizens for Prot. of N. Kohala Coastline v. Cnty. of Hawai'i, 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999) (brackets and citation omitted). Under the "rule of reason,"
>
>> an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved

and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

Kaleikini v. Yoshioka, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012) (quoting Price v. Obayashi Hawai'i Corp., 81 Hawai'i 171, 182, 914 P.2d 1364, 1375 (1996)).

## A.    Procedural Background

### 1.    BLNR proceedings

After the Umberger injunction, PIJAC prepared an EIS in pursuit of permits to continue commercial aquarium fishing in the WHRFMA.  In May 2020, BLNR held a public meeting to determine if the EIS satisfied HEPA. BLNR voted unanimously to reject it, citing fourteen reasons for the rejection.  In accordance with procedure in effect at the time, PIJAC appealed BLNR's non-acceptance to the environmental council, which affirmed BLNR's decision but held that BLNR's reasons 4, 11, and 14 were arbitrary and capricious.  Plaintiffs appealed to the environmental court, arguing they should have been allowed to intervene and that the council's holding regarding Reason 11 was wrong.  In March 2021, the environmental court vacated the Environmental Council's decision and remanded to BLNR for further proceedings.  Those proceedings were cut short, however,

when Act 152[3] took effect in July 2021, which transferred the Environmental Council's jurisdiction over EIS rejection appeals to the environmental court.  See 2021 Haw. Sess. Laws Act 152 § 15 at 576.

PIJAC began preparing a revised EIS.  It published the revised draft EIS (RDEIS) in February 2021.  During the mandatory public comment period, fisherman Willie Kaupiko, conservation and animal protection organizations For the Fishes and Center for Biological Diversity, and native Hawaiian cultural practitioners Kai Palaoa (collectively, Plaintiffs) commented extensively.  Plaintiffs identified what they believed to be deficiencies identical to those of the initial EIS.  PIJAC published the 1,585-page RFEIS in June 2021.  Later that month, following a public meeting on whether the RFEIS complied with HEPA, three BLNR members voted to accept and three voted to reject the statement.

**[https://files.hawaii.gov/dlnr/meeting/audio/Audio-LNR-210625-1.m4a]**

---

[3]     Act 152 replaced the Environmental Council with the Environmental Advisory Council and administratively transferred the Environmental Advisory Council from the Department of Health to the Office of Planning and Sustainable Development.  See 2021 Haw. Sess. Laws Act 152 § 2 at 567. HRS § 341-6 (2022) sets out the functions of the Environmental Advisory Council.  The purpose of Act 152 was to "transfer the purpose, functions, and duties of the office of environmental quality control and environmental council to the office of planning to improve the coordination of these related planning functions so state government can work more efficiently to achieve the State's long-term environmental quality goals for a more abundant future for the people of Hawai'i."  Id., § 1 at 567.

Ordinarily, BLNR sits as a seven-member board. However, one member was absent from the public hearing on the subject RFEIS.  Without a subsequent meeting, the RFEIS was "deemed to be accepted" by operation of law.  See HRS § 343-5(e) ("The agency receiving the request, within thirty days of receipt of the final statement, shall notify the applicant and the office of the acceptance or nonacceptance of the final statement.  The final statement shall be deemed to be accepted if the agency fails to accept or not accept the final statement within thirty days after receipt of the final statement.") (Emphasis added).

### 2. Environmental court proceedings

In July 2021, Plaintiffs sued the DLNR and BLNR (collectively, the State) in the Environmental Court for the First Circuit, seeking declaratory and injunctive relief concerning the default acceptance of the RFEIS.[4]  The environmental court permitted PIJAC's request to intervene in the case.  The State then filed a motion to dismiss, arguing the State was not the proper defendant in the suit because the RFEIS's "'acceptance' was achieved by by operation of law and not due to any 'decision' by the Agency."  The environmental

---

[4]     The Honorable Jeffrey P. Crabtree presided.

court denied the State's motion to dismiss.  That denial is the subject of the State's cross-appeal.

Plaintiffs moved for summary judgment, challenging BLNR's acceptance of the RFEIS on the basis of content deficiencies.  The environmental court determined that the requirements under HAR § 11-200-23(e) do not impose a higher standard than the otherwise applicable "rule of reason" established in Price, 81 Hawai'i 171, 914 P.2d 1364.  The Price rule of reason states that, in evaluating an EIS, "we use the 'rule of reason' to determine whether the EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision."  Id. at 182, 914 P.2d at 1375 (quoting Life of the Land v. Ariyoshi, 59 Haw. 156, 164-65, 577 P.2d 1116, 1121 (1978)).  Therefore, the question at issue was whether the RFEIS disclosed sufficient information to enable BLNR to make an informed decision.  In its August 16, 2022 Ruling on Plaintiffs' motion for summary judgment, the environmental court analyzed the initial non-acceptance of the initial EIS, how the RFEIS addressed the reasons for that non-acceptance, and other deficiencies alleged by Plaintiffs.

    a.    **Initial non-acceptance: catch/sustainability levels**

BLNR rejected the initial EIS in part due to its reliance on a non-peer-reviewed field manual that stated that

taking five to twenty-five percent of a fish population is a sustainable level of annual take. The RFEIS abandoned that take level in favor of a catch limit based on a twenty-year historic average catch from the entire WHRFMA, or 1% of the population estimate. In other words, for each of the eight "white-listed" (permitted) species, the RFEIS proposed a catch quota. To calculate the catch quota for each species, the RFEIS used either the twenty-year historic average catch rate from the entire WHRFMA, or it used 1% of the population estimate from a 2019 survey. This stands in contrast with the initial EIS's proposed catch quota, which was 5-25% of each of forty species. The environmental court cited multiple sections of the body and the appendices of the RFEIS that discussed the sustainability level of the proposed take on a species-by-species basis and determined that the RFEIS disclosed sufficient information regarding catch levels to enable BLNR to make an informed decision.

b.    **Initial non-acceptance: relevant negative findings**

BLNR also rejected PIJAC's initial EIS on the basis of its failure to account for the harmful impacts of aquarium collection, citing, for example, the reduced numbers of aquarium fish at certain collection cites discussed in a 2003 article by Brian Tissot and Leon Hallacher. In response, PIJAC argued two

points before the environmental court: (1) the RFEIS cannot be accepted or rejected on the basis of an alleged failure to discuss a single article, one which was disclosed and commented on in the RFEIS and the authors of which co-signed a letter to BLNR supporting the RFEIS; and (2) the RFEIS must be assessed in its entirety.

The environmental court quoted sections of both the body and appendix of the RFEIS that discussed the impact of the proposed catch on the species most affected in the WHRFMA. It further cited a comment letter from a member of the State of Hawai'i Division of Aquatic Resources (DAR) supporting the RFEIS in discussing the impacts of the proposed take within the WHRFMA. The environmental court concluded that the RFEIS disclosed sufficient information regarding the impacts of aquarium fishing on the proposed fish species to allow BLNR to make an informed decision.

### c.   Initial rejection: cultural impacts

BLNR also rejected the initial EIS due to its failure to sufficiently consider the cultural impact of the proposed aquarium fishing program. PIJAC argued that data disclosed in the RFEIS show that the eight targeted fish populations are sustainable and therefore, the proposed take should not negatively impact cultural practices of those that rely on the WHRFMA, while acknowledging that cultural practitioners may view

12

any amount of take as harmful.  The environmental court quoted excerpts from the body and appendix of the RFEIS, noting that the appended "Cultural Impact Assessment" in the RFEIS is 146 pages.  The Cultural Impact Assessment can be found, in its entirety, in Appendix A to the RFEIS, and the assessment's conclusions are summarized in the "Executive Summary" in the body of the RFEIS.

Further, the environmental court cited the section of the RFEIS analyzing the proposed take of the eight selected species, noting that each individual section included a sub-section on the cultural significance for that species.  The court acknowledged that the cultural impact of the collection of the proposed species is subject to disagreement as seen in the appended comments to the RFEIS.  It concluded that this disagreement is not in itself grounds for rejecting the RFEIS and determined that the RFEIS sufficiently disclosed the differences to allow BLNR to make an informed decision.

In addition to analyzing BLNR's reasons for rejecting the initial EIS, the environmental court also evaluated Plaintiffs' arguments in their motion for summary judgment (MSJ), as detailed below.  Plaintiffs argued that BLNR violated HEPA when it failed to reject the RFEIS for not satisfying various HEPA EIS content requirements including PIJAC's the baseline fish population, economic impacts, and mitigation

measures.  They also contend that "since BLNR rejected PIJAC's Oahu EIS just a few months later for some of the same concerns as the instant EIS, the Board's approval of the Big Island RFEIS was arbitrary and capricious."  Plaintiffs argued that these alleged content deficiencies are fatal to the RFEIS.

### d.    O'ahu FEIS

In tandem with its WHRFMA RFEIS, PIJAC had prepared and submitted a final EIS (FEIS) on behalf of commercial aquarium fishermen seeking collection permits on the island of O'ahu.  In October 2021, not long after it evaluated the WHRFMA RFEIS at issue in this case, BLNR considered the sufficiency of the O'ahu FEIS at a public hearing.  On a motion for non-acceptance, BLNR voted 6-0[5] to not accept the FEIS.

BLNR determined that the O'ahu FEIS "fail[ed] to provide sufficient information about the anticipated impacts . . . and where impacts [we]re identified, it fail[ed] to set forth appropriate mitigation measures to avoid, minimize, rectify, or reduce those impacts."  Plaintiffs argued that, because BLNR rejected the O'ahu EIS for similar concerns as the WHRFMA RFEIS, BLNR's approval of the WHRFMA RFEIS was arbitrary and capricious.  The environmental court disagreed, finding that each EIS "stands or fails on its own merits" and that factors

---

[5]    One voting member abstained.

that lead to the rejection of one EIS may not be weighed equally for another.

### e.    Baseline fish population

Plaintiffs further argued that HEPA requires an EIS to disclose and discuss cumulative impacts over time, including the impact of the proposed commercial aquarium take on the baseline fish population.  It claimed that this EIS's depleted baseline fish data did not give BLNR sufficient information to make an informed decision.  The environmental court quoted a five-page section from the RFEIS discussing the "best available science" on baseline fish populations in the WHRFMA.  It determined that, while the parties disagree on the quality of and proper method of analyzing baseline fish population data, there is no dispute that the RFEIS contained such information and discussion.  The court ruled that such differences do not require BLNR to reject a RFEIS and found that the RFEIS disclosed and discussed sufficient information to permit BLNR to make an informed decision.

### f.    Economic impacts

Plaintiffs also argued that the RFEIS failed to satisfy HEPA's economic impact disclosure requirements, asserting that the RFEIS only discussed revenue for the aquarium collectors.  They averred that the RFEIS failed to address a 2021 cost-benefit analysis article (Schaar and Cox), claiming that the article supported its position.  The environmental

court disagreed, finding that the RFIES discussed the article in multiple places in the appendices. Citing additional sections of the RFEIS's body and appendix, the court held that the RFEIS sufficiently discussed statewide socioeconomic issues and per-fish economic impacts to allow BLNR to make an informed decision.

### g. Mitigation Measures

Plaintiffs argued that BLNR violated HEPA when it failed to reject the RFEIS because it did not discuss mitigation measures as statutorily required under HRS § 343-2 and HAR § 11-200-17(b)(3) (2018) (repealed 2019). Specifically, Plaintiffs pointed to the RFEIS's lack of analysis on the issue of reporting catch data by smaller, "local areas," as opposed to larger, "zones," a practice that may disguise overfishing or depletion. Plaintiffs' argument here is emblematic of several of their arguments. They consider the failure to include specific content as fatal to the RFEIS, despite discussion of other relevant content in the body and appendices of the RFEIS. The RFEIS discusses mitigation measures — for example, its reduction of the types of species from forty to eight — but not all of the mitigation measures that Plaintiffs assert are relevant or required.

The environmental court referenced an email appended to the RFEIS describing Fishery Management Areas (FMAs) as

having successfully spurred increases in the populations of the most abundantly captured fish. While not adopting these findings, the court considered their discussion to be representative of the fact that the RFEIS disclosed and discussed information on existing FMA mitigation that was sufficient to permit BLNR to make an informed decision.

### h. Alleged deficiencies related to the DAR Determination

DAR submitted a Determination document prepared by its staff, weighing in on whether the RFEIS complies with applicable law. The DAR Determination raised concerns regarding the proposed take for two of the eight species but ultimately concluded that "the RFEIS sets forth sufficient information to consider fully the environmental impacts of the proposed action and make a reasoned decision." As to coral reef health, the DAR recommended that the issue be "carefully considered" in future decisions up to and including during the permitting process. Plaintiffs assert that this recommendation violated HEPA because a full environmental review at the earliest practicable time is a condition precedent to acceptance of an EIS. The environmental court agreed that BLNR's environmental review must be "front-loaded" to allow early and informed decision-making, but the court concluded that the RFEIS did disclose and discuss impacts to coral reefs and the two species the DAR Determination

17

identified.  The environmental court further noted that the DAR Determination ultimately supported the RFEIS.  While not adopting DAR's statement, the environmental court found that the statement indicated that the DAR's concerns did not lead to the conclusion that the RFEIS disclosed insufficient information for BLNR to make an informed decision.

On August 16, 2022, the environmental court entered its written Ruling denying Plaintiffs' motion for summary judgment.  It held that as a matter of law, "the RFEIS provided sufficient information to enable the Board to make an informed and reasoned decision" under the Price "rule of reason" standard.  The court noted that it ruled exclusively on whether the RFEIS disclosed sufficient information to enable BLNR to make an informed decision, rather than "decide which side of the 3-3 vote was 'correct.'"

On September 12, 2022, the environmental court entered a written order denying Plaintiffs' motion for summary judgment, as well as a final judgment in favor of the defendants, the State and PIJAC, and against all plaintiffs.

3. **Appellate proceedings**

Plaintiffs appealed the environmental court's order denying their motion for summary judgment and the environmental court's final judgment.  The State filed a cross-appeal

regarding the environmental court's denial of the State's motion to dismiss.

In its opening brief before the ICA, the State argued a single point of error: the environmental court erred in ruling that a tie vote by BLNR resulting in acceptance by operation of law under HRS § 343-5(e) was a "decision" by BLNR to accept the RFEIS, such that BLNR must be named in any lawsuit seeking judicial review on the merits.  It claimed that the tie vote on the motion to accept the RFEIS did not constitute a "decision" and that "[i]t would be absurd to force the Agency [BLNR] to defend a 'decision' it did not make." (Emphasis omitted.)  The State argues that to interpret HRS § 343-5(e) otherwise would render the statute a nullity and force BLNR to "expend significant time and resources to defendant a 'decision' that the Agency did not make."  (Emphasis omitted.)  Pointing to language of HRS § 343-7(c)(2022), the State argued that the statute is silent on who is required to defend a challenge to an acceptance of an EIS.  The State further argues that PIJAC, and not BLNR, is the proper defendant because PIJAC authored and proposed the RFEIS to BLNR.

In February 2023, Plaintiffs timely applied for transfer to this court.  We accepted transfer in March 2023.  In their appeal, Plaintiffs assert that the environmental court erred for three reasons: (1) the court misapplied the "rule of

reason" standard under Price; (2) the court "[i]mproperly relied on the contents of [RFEIS] comment letters and responses instead of the disclosure and analysis that must be included in the revised EIS itself;" and (3) the court "[f]ailed to uphold HEPA's requirements to disclose environmental impacts," including aquarium collection's cumulative impacts, the impacts of concentrated take, the economic impacts to the broader community and State of Hawai'i, and the impacts of increasing take for some species far beyond historical catch levels. The parties finished briefing the case after we accepted transfer.

### III.  Standards of Review

#### A.  Agency Determinations Under HEPA

Under HEPA, "whether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo."  Kia'i Wai v. Dep't of Water, 151 Hawai'i 442, 454, 517 P.3d 725, 737 (2022).

#### B.  Environmental Impact Statement Sufficiency

The sufficiency of an EIS is a "question of law, which is properly addressed through the summary judgment procedure. This is because the only question presented is whether the EIS complies with applicable statutory mandates, such as HRS chapter 343 and EIS Rules chapter [11-]200."  Price, 81 Hawai'i at 182, 914 P.2d at 1375.

Courts use the "rule of reason" in determining the sufficiency of the EIS.

> [W]e use the "rule of reason" to determine whether the EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision. Life of the Land v. Ariyoshi, 59 Haw. 156, 164, 577 P.2d 1116, 1121 (1978).
>
> In Life of the Land, we enunciated the standard of review that governs a court's determination as to whether an EIS satisfies the statutory requirements:
>
> > In making such a determination the court is guided by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

Id. (quoting Life of the Land, 59 Haw. at 164-65, 577 P.2d at 1121) (citation omitted).

**C.  Motions to Dismiss**

"A trial court's ruling on a motion to dismiss is reviewed de novo." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008).

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [their] claim that would entitle him or her to relief. This court must, therefore, view a plaintiff's complaint in a light most favorable to [them] in order to determine whether the allegations contained therein could warrant relief under any alternate theory. . . . Consequently, in reviewing the [environmental] court's order dismissing the plaintiffs' complaint in this case, our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true.

21

Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007) (quotation omitted).

## D.    Motions for Summary Judgment

"A trial court's ruling on a motion for summary judgment is reviewed de novo under the right/wrong standard." Umberger, 140 Hawai'i at 512, 403 P.3d at 289 (citing Salera v. Caldwell, 137 Hawai'i 409, 415, 375 P.3d 188, 194-95 (2016).

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. at 527-28, 403 P.3d at 304-05 (quoting Lambert v. Waha, 137 Hawai'i 423, 432 n.9, 375 P.3d 202, 211 n.9 (2016)).

## E.    Statutory Construction and Interpretation of Agency Rules

"General principles of statutory construction apply" to this court's interpretation of agency rules.  Cmty. Ass'ns of Hualalai, Inc. v. Leeward Plan. Comm'n, 150 Hawai'i 241, 259, 500 P.3d 426, 444 (2021) (citation omitted).

> If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning. While an agency's interpretation of its own rules

>             is generally entitled to deference, this court does not
>             defer to agency interpretations that are plainly erroneous
>             or inconsistent with the underlying legislative purpose.

Id. (citation omitted).

## IV.   Discussion

We first address the State's motion to dismiss.  Then we address whether a revised EIS must, in addition to the requirements of Price, also meet the requirements of HAR § 11-200-23(e) and "fully address the inadequacies of the non-accepted EIS."  Finally, we address whether the EIS at hand was sufficient.

## A.       The State is a Proper Party to the Case

The State argues that because the EIS was "deemed to be accepted" via the 3-3 BLNR vote, the State did not make an affirmative decision and thus should not be charged with defending this suit.  See HRS § 343-5(e).  Instead, the State argues, PIJAC should defend the merits of the RFEIS because PIJAC was the author of the RFEIS.  The environmental court denied the State's motion to dismiss.  We affirm the environmental court's denial.

HRS § 343-5(e) states that a final EIS "shall be deemed to be accepted if the agency fails to accept or not accept the final statement within thirty days after receipt of the final [EIS]."  HRS § 343-7(c) then provides for judicial review of the "acceptance or nonacceptance of an environmental

23

impact statement required under section 343-5." As to judicial review, HRS § 343-7(c) does not differentiate between whether the EIS was accepted by a majority vote or via deemed acceptance. Nor does any other part of the statute differentiate as to outcomes following from a deemed acceptance versus a majority-voted-upon acceptance. A deemed acceptance is still an acceptance, and it therefore subject to judicial review.

The State cites to Haw. Elec. Light Co. v. Dep't of Land & Nat. Res., 102 Hawai'i 257, 75 P.3d 160 (2003) (HELCO). As the environmental court wrote, however, HELCO is "easily distinguishable." That case involved HRS § 183-41(a) (1993) (repealed 1994), which provided, "if within one hundred eighty days after receipt of the application the department shall fail to give notice, hold a hearing, and render a decision, . . . [the] owner may [then] automatically put the owner's land to the use or uses requested in the owner's application." Id. at 262, 75 P.3d at 165 (quoting HRS § 183-41(a)). There, BLNR failed to make a decision on an applicant's conservation district land use application. Id. at 270-71, 75 P.3d at 174-75. Because BLNR neither granted nor declined the application in that case, we held that there was no decision capable of being reversed. Id. HELCO is inapplicable because the statute there had no deemed acceptance provision.

24

The appeal of the acceptance of an EIS is just that —
an appeal of the <u>acceptance</u>, not just the EIS itself.  In
creating a deemed acceptance provision, the legislature intended
a tie vote to be construed as an acceptance (unlike in <u>HELCO</u>).
And if PIJAC were the only necessary party to the case for
judicial review, judicial review would be limited to only the
content of the EIS and not the procedures used to decide upon
it.  We therefore affirm the environmental court's denial of the
State's motion to dismiss.

**B.    The Proper Standard for Court Review of a RFEIS is to
       Consider the Rule of Reason Along with HEPA's Substantive
       Requirements**

The sufficiency of an EIS is a "question of law, which
is properly addressed through the summary judgment procedure.
This is because the only question presented is whether the EIS
complies with applicable statutory mandates, such as HRS chapter
343 and EIS Rules chapter [11-]200."  <u>Price</u>, 81 Hawai'i at 182,
914 P.2d at 1375.

Hawai'i courts have used the "rule of reason" in
determining the sufficiency of the EIS.

> [W]e use the "rule of reason" to determine whether the EIS
> is legally sufficient in adequately disclosing facts to
> enable a decision-making body to render an informed
> decision. <u>Life of the Land v. Ariyoshi</u>, 59 Haw. 156, 164,
> 577 P.2d 1116, 1121 (1978).
>
> In <u>Life of the Land</u>, we enunciated the standard of review
> that governs a court's determination as to whether an EIS
> satisfies the statutory requirements:

25

> In making such a determination the court is guided by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1375 (2d Cir.[ ]1977), cert. den., 434 U.S. 1064[.]

Price, 81 Hawai'i at 182, 914 P.2d at 1375 (quoting Life of the Land, 59 Haw. at 164-65, 577 P.2d at 1121).

The environmental court here wrote the following:

> The court attempts to focus on 1) the reasons for the initial non-acceptance of the EIS, 2) whether the revised FEIS fully addressed those reasons, 3) whether the RFEIS completely discussed the changes made, and 4) whether the RFEIS satisfactorily addresses the findings and reasons for non-acceptance. See Section 11-200-23(e).[6] However, the court concludes these requirements under Section 11-200-23(e) ultimately do not impose any higher standard than the "rule of reason" set forth in Price. In other words, although Price was an EIS case, and although a revised EIS is required to address the non-accepted items from the initial EIS, the ultimate standard is still the rule of reason as set forth in Price: does the RFEIS adequately disclose sufficient facts to enable BLNR to render an informed decision? Since the Board voted 3-3, reasonable minds can clearly differ on the issues raised. This court is not to decide which side of the 3-3 vote was "correct."

---

[6]  HAR § 11-200-23(e) reads:
A non-accepted EIS may be revised by a proposing agency or applicant. The revision shall take the form of a revised draft EIS document which shall fully address the inadequacies of the non-accepted EIS and shall completely and thoroughly discuss the changes made. The requirements for filing, distribution, publication of availability for review, acceptance or non-acceptance, and notification and publication of acceptability shall be the same as the requirements prescribed by sections 11-200-20, 11-200-21, 11-200-22, and 11-200-23 for an EIS submitted for acceptance. In addition, the revised draft EIS shall be evaluated for acceptability on the basis of whether it satisfactorily addresses the findings and reasons for non-acceptance.

> This court's job is to decide whether the RFEIS was legally sufficient. Did it adequately disclose facts so that the agency could render an informed decision?

(Emphasis in original.)

This court has not yet considered, in determining the sufficiency of an EIS, whether the rule of reason must be considered in conjunction with the content requirements provided by HEPA and the applicable HAR. Following precedent from the National Environmental Policy Act (NEPA), on which HEPA is modeled, we conclude that it should.

Federal caselaw is instructive here. As a preliminary matter, the rule of reason is the backbone of NEPA precedent. See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004) ("[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."). In applying the rule of reason to an EIS, the Tenth Circuit wrote that the standard helps decide "whether claimed NEPA violations 'are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment.'" Dine Citizens Against Ruining our Env't v. Bernhardt, 923 F.3d 831, 852 (10th Cir. 2019) (quoting Utahns for Better Transp. v. U.S. Dep't of

Transp., 305 F.3d 1152, 1163 (10th Cir. 2002).  Elsewhere, the Fourth Circuit wrote that:

> [the court] may not "flyspeck" [the] agency's environmental analysis, looking for any deficiency, no matter how minor. Instead, we must take a holistic view of what the agency has done to assess environmental impact and examine all of the various components of [the] agency's environmental analysis. . . to determine, on the whole, whether the agency has conducted the required "hard look."

Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421-22 (2012) (internal quotation marks omitted);  see also Habitat Educ. Ctr., Inc. v. U.S. Forest Serv., 673 F.3d 518 (7th Cir. 2012).

Federal courts use the rule of reason and analyze whether alleged NEPA violations are "merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment."  Utahns for Better Transp., 305 F.3d at 1163.  They also ensure that the agency had the information it needed to make an informed decision and took a hard look at the EIS and the environmental consequences.  Our courts should do the same.

A reviewing court in Hawai'i should consider whether the EIS meets the content requirements set out by the HAR, using the rule of reason to ensure that the EIS was:

> compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

Price, 81 Hawai'i at 183, 914 P.2d at 1376 (quoting Life of the Land, 59 Haw. at 164-65, 577 P.2d at 1121). "Additionally, 'courts are reluctant to second guess the decision-making body regarding the sufficiency of an EIS.'" Kaleikini v. Yoshioka, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012) (quoting Price, 81 Hawai'i at 182, 914 P.2d at 1375) (internal quotation marks omitted).

The HAR sets forth the environmental factors that the court should consider. See HAR § 11-200-17. Those factors include (but are not limited to): the significant beneficial and adverse impacts (including cumulative impacts and secondary impacts), proposed mitigation measures, alternatives considered, unresolved issues, and compatibility with land use plans and policies. Overall, an EIS should "be sufficiently detailed to allow the comparative evaluation of the environmental benefits, costs, and risks of the proposed action and each reasonable alternative." HAR § 11-200-17.

The court should ensure that "the agency has taken a hard look at environmental factors, and, if the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be arbitrary and capricious, given the known environmental consequences." Unite Here! Local 5 v. City & Cnty of Honolulu, 123 Hawai'i 150, 171, 231 P.3d 423, 444 (2010) (quoting Life of the Land, 59 Haw. at

182 n.12, 914 P.2d at 1375 n.12) (quotation marks and brackets omitted).

Next, the reviewing court should ensure compliance with HAR § 11-200-18 and HAR § 11-200-23,[7] which govern the requirements of a final EIS and the standards for acceptability. HAR § 11-200-18 requires a final EIS to contain:

> (1)  The draft EIS revised to incorporate substantive comments received during the consultation and review processes;
>
> (2)  Reproductions of all letters containing substantive questions, comments, or recommendations, and, as applicable, summaries of any scoping meetings held;
>
> (3)  A list of persons, organizations, and public agencies commenting on the draft EIS;
>
> (4)  The responses of the applicant or proposing agency to each substantive question, comment, or recommendation received in the review and consultation processes[;]
>
> (5)  The text of the final EIS which shall be written in a format which allows the reader to easily distinguish changes made to the text of the draft EIS.

HAR § 11-200-23 governs the rules for acceptability. As relevant here, HAR § 11-200-23(e) requires the revised EIS to "fully address the inadequacies of the non-accepted EIS . . . the revised draft EIS shall be evaluated for acceptability on the basis of whether it satisfactorily addresses the findings and reasons for non-acceptance."  The focus of the reviewing court here should be on the following: first, does the final EIS contain the information required by HAR, such that the agency

---

[7]     HAR § 11-200-18 is now 11-200.1-27 (2021) and HAR § 11-200-23 is now 11-200.1-28.  Both new rules are substantially the same.

30

could consider fully the environmental factors involved to make a reason decision?  Second, did the final EIS actually address the substantive feedback it received, both from the agency's feedback on the previous draft version (if any) and from the public and any other parties?  Third, are the alleged errors significant enough to defeat the goals of informed decision making and informed public comment?

To summarize, the reviewing court should first look to HAR § 11-200-17 (now 11-200.1-24) and ensure that, under the rule of reason, the EIS contains enough information to enable the decision-maker to make a reasoned decision concerning the environmental factors described in the rule.  Second, the reviewing court should look to HAR § 11-200-18 (now 11-200.1-27) to ensure that the finalized version of the EIS addressed the initial reasons for rejection (if any) and that the EIS was revised to respond to substantive feedback received during the process.  In evaluating the EIS's compliance with the HAR, the reviewing court should use the rule of reason and ask whether the alleged HEPA violations frustrate the goals of informed decision-making and informed public comment.

## C.   The Environmental Court Did Not Err in Concluding that the RFEIS Complied with HEPA

Following the appropriate standard for review described supra, we conclude that the environmental court did

31

not err in concluding that the RFEIS complied with HEPA.
Accordingly, we affirm the environmental court's denial of
Plaintiffs' motion for summary judgment and its final judgment
in favor of the State and PIJAC.

> **1. The environmental court did not err in relying on appended information in the EIS**

Preliminarily, we address Plaintiffs' argument that
the environmental court erred in relying on information from the
EIS's appendices. HAR § 11-200-18 (now 11-201.27) requires that
the final EIS must, among other things, "incorporate substantive
comments received during the consultation and review processes"
and include "responses of the applicant or proposing agency to
each substantive question, comment, or recommendation received
in the review and consultation process." In the environmental
court's order, there are several instances in which the court
relies on comment letters and other appended information to
conclude that the EIS "adequately disclose[d] facts so that the
agency could render an informed decision." Plaintiffs argue
that by relying on comment letters and appended information, the
court impermissibly shifted the burden of disclosing impacts to
the public.

We disagree. HAR § 11-200-18's mandate that a final
EIS must "incorporate substantive comments" does not require
that the substantive comments must be incorporated into the body

(as opposed to an appendix) of the EIS.  The purpose of the EIS here was to ensure that BLNR made a fully informed decision as to the environmental impact of commercial aquarium permits in the WHRFMA.  That purpose is not defeated when important information is held in an appendix.  Rather than creating an artificial delineation between the body of an EIS and its appendices, the appendix should be considered part of a complete document.  Of course, the document must still "enable a decision-making body to render an informed decision," Price, 81 Hawaiʻi at 182, 914 P.2d at 1375, and alleged violations should not "defeat the goals of informed decisionmaking and informed public comment."  Utahns for Better Transp., 305 F.3d at 1163.  In other words, the EIS should not just be a "document dump," but rather a cohesive document that informs the approving agency and the public.

Plaintiffs cite two cases for the proposition that the environmental court erred in relying on appended information.  The first is Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157 (9th Cir. 2003), a NEPA case.  There, the Ninth Circuit held that the Forest Service was required to disclose and respond to comments that directly challenged the scientific basis central to the EIS.  The key scientific question was whether Northern Goshawks, a type of hawk found on the mainland, were habitat generalists (as the agency argued) or habitat

specialists (as opponents argued). The agency in that case impermissibly redacted a portion of a comment letter; the redacted material contained an important scientific paper expressing views different from the EIS. The Ninth Circuit also held that the agency could not point to internal memoranda from the Forest Service (that were not part of the EIS) to demonstrate that the agency responded to the pertinent concern. It does not follow from this holding that the disclosures required by the HAR cannot be in an appendix. HAR § 11-200-18 requires an EIS to incorporate substantive comments received, reproduce all letters received containing substantive feedback, and include the applicant's responses to those letters. An agency can so incorporate, reproduce, and include via an appendix. See Earth Island Inst. v. Carlton, No. 2:09-CV-02020-MCE, 2012 WL 1130650, at *9 (E.D. Cal. Mar. 29, 2012) ("Center for Biological Diversity, cited by Plaintiff for this assertion, merely states that the response cannot come in the administrative record outside of the EIS; it does not hold that the response cannot come in an appendix to the EIS.").

The second case cited is Oregon Nat. Res. Council v. Marsh, 832 F.2d 1489 (9th Cir. 1987), another NEPA case in the Ninth Circuit. The case concerned a dam construction project proposed by the Army Corps of Engineers. The court there held that

> an agency may place responsible opposing views in a
> separate 'comments and responses' section when, as here,
> many of the critical comments prompted revisions in the
> body, the Corps discussed in the body all of the
> environmental problems to which the comments were
> addressed, and the Corps provided thoughtful and well-
> reasoned responses to most of the critical comments.  We
> therefore hold that the Corps sufficiently complied with
> the purposes of the NEPA in its treatment of opposing
> views.

Id. at 1498-99.

This case supports the holding that the environmental court can base its findings on the contents of an appendix.  HAR § 11-200-1 sets out the purpose of the administrative rules under § 11-200, which is to ensure that environmental concerns are given appropriate consideration in decision making.  Here, the letters received in response to the initial FEIS were incorporated via their inclusion in an appendix.  The EIS also similarly provided "thoughtful and well-reasoned" responses to most of the critical comments.  Some responses are simply responses to a comment; some responses point the reader to particular parts of the body of the EIS; and some responses point the reader to amended parts of the body of the EIS.  There were many comments that were duplicative, to which the EIS responded "[y]our comment has been forwarded to the decision makers."  Like the agency at issue in Marsh, the EIS "discussed in the body all of the environmental problems to which the comments were addressed."

Here, the environmental court relied on comment submissions to find that the RFEIS included mitigation measures and baseline fish population data as required by HEPA. Regarding mitigation, the court explicitly wrote that Dr. Walsh's letter and the other sections he included discussing fish populations at collection sites are not the only sections of the RFEIS that discuss the issue, but were included as representative samples. It therefore found there was sufficient information regarding impacts of aquarium fishing on the fish species proposed for collection and that the RFEIS adequately disclosed facts to allow the agency to render an informed decision.

On the baseline fish population data requirement, the environmental court wrote "[t]he parties disagree on how good the baseline information is, and how to analyze it, but there is no question baseline information is in the RFEIS and was available to BLNR." The court then quoted a letter from Drs. Carlson, Pyle, and Kosaki, included in one of the appendices, where the three scientists discuss issues from a scientific paper and their disagreements with that paper's conclusions regarding baseline fish populations. It then wrote, "the above shows differences of opinion about the data and conclusions. Such differences do not require DLNR to reject the RFEIS. The court concludes the RFEIS made sufficient disclosures to allow

36

the agency to make an informed decision on baseline populations and cumulative impacts over time."

The issue of whether an environmental court may rely on appended comments in determining that the EIS was legally sufficient is one of first impression. The goal of the RFEIS is to ensure that "environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HAR § 11-200-1 (2018) (now 11-200.1-1). The acceptability of an EIS is "evaluated on the basis of whether the statement, in its completed form, represents an informational instrument which fulfills the definition of an EIS and adequately discloses and describes all identifiable environmental impacts and satisfactorily responds to review comments." HAR § 11-200-23 (2018) (now 11-200.1-28). In other words, the EIS should "enable a decision-making body to render an informed decision," Price, 81 Hawai'i at 182, 914 P.2d at 1375, and alleged violations should not "defeat the goals of informed decisionmaking and informed public comment." Utahns for Better Transp., 305 F.3d at 1163.

Confining an environmental court's analysis to non-appended information is arbitrary when the decision-making body, BLNR in this case, makes its decision based on the entirety of the EIS. If we forced every EIS to include every piece of relevant information and every comment and response in the body,

the statement would balloon to thousands of pages, decreasing the public accessibility of the document. Rather, an appendix provides readers with important information while not overwhelming them with every piece of information at once. Of course, the EIS should not just shove all relevant documents into an appendix. The body of the EIS should give a reader guidance as to where to find information through the document, including appendices. The EIS at issue here did so, describing what is in each appendix and, throughout the body of the EIS, referencing parts of appendices and information therein throughout. We therefore hold that the environmental court did not err in relying on appended information.

## 2. **The EIS was legally sufficient**

The sufficiency of an EIS is a "question of law." Price, 81 Hawai'i at 182, 914 P.2d at 1375.

First, we use the rule of reason to determine whether the EIS contains enough information to enable the decision-maker to make a reasoned decision concerning the relevant environmental factors. We focus our analysis on the deficiencies alleged by Plaintiffs, which include (a) disclosure of commercial aquarium collection's cumulative impacts; (b) assessments of mitigation measures; (c) analysis of economic impacts, and (d) analysis of the impacts of increasing the take above historical catch rates.

### a.    Cumulative impacts

HAR § 11-200-17(b)(2) (2018) (now HAR § 11-200.1-24) requires disclosure of the cumulative impacts of commercial aquarium collection.  Cumulative impacts is defined by HAR § 11-200-2 as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions."  The EIS thoroughly presents and discusses the cumulative impact of commercial aquarium fishing.

Section 5.4 of the RFEIS summarizes the cumulative impact of aquarium collection on biological resources, calculated based on historic trends.  Much of the data in this section, it appears, is based on independent research conducted by DAR. DAR's research, a four-year monitoring report conducted in collaboration with the National Oceanic and Atmospheric Administration (NOAA), is appended in full.

Plaintiffs' central allegation here is that the EIS uses the wrong baseline data.  Baseline data is the measure of a condition before an action is taken — in this case, estimates of fish populations.  It is important because, to assess the cumulative impacts of the proposed action, the RFEIS compares the projected impact of aquarium fishing against the baseline data.  For its baseline data, the EIS contains current

population estimates and trends from DAR and NOAA's report.

Plaintiffs argue that this is the wrong baseline because it does not account for the effect past aquarium fishing has had on fish populations, including underreporting and poaching.  Instead, Plaintiffs argue, the baseline should be what fish populations would look like without any aquarium fishing.

The RFEIS discloses its baseline.  At the beginning of Section 4.0, the EIS reads:

> The affected environment is the area and its resources (i.e., socioeconomic, cultural, physical, biological) potentially impacted by the proposed action and the alternatives under consideration. The purpose of describing the affected environment is to define the current baseline of conditions in which the impacts would occur. To make an informed decision about which alternative to select, it is necessary to first understand which resources would be affected and to what extent each alternative would result in changes from the baseline. This section attempts to provide the baseline for this understanding. Relative to the proposed action, the affected environment includes nearshore habitats within the WHRFMA from a depth of 0-600 feet (0-100 fathoms) along the west coast of the island of Hawai'i, although most fishers collect the majority of fish at depths between 30-70 feet (5-11.7 fathoms), with minimal collecting beyond this range.
>
> Commercial aquarium fish collection has been taking place in Hawaiian waters since the late 1940s. In 1953, the territorial government of Hawai'i enacted Act 154, which authorized the Board of Agriculture and Forestry to establish a permit system for the use of fine-mesh nets and traps for the taking of aquarium fish (DAR 2014a). Beginning in 1973, collectors were required to report their monthly catch on a detailed aquarium fish catch report. As of 2014, Aquarium Permit holders are required to keep daily trip reports and submit on a monthly basis. Since 1999 when FRA's were established, the number of commercial aquarium fishers working in West Hawai'i has ranged from 24-63, and in East Hawai'i from <3-18 (DAR 2018a). The 10 commercial fishers who are part of this proposed action made up 2 to 8 of the WHRFMA fishers in any given year from 2000 – 2017. <u>Permitted commercial aquarium fishing has been a part of</u>

> the socioeconomic, cultural, physical, and biological
> resources for decades and is considered a part of the
> baseline condition of the affected environment.

(Emphasis added.)

The RFEIS goes into even more detail regarding its baseline data in Section 5.4.3.3.

Appendix C of the RFEIS reproduces all letters and comments that the revised EIS received. In at least two letters (one from Sierra Club, another from For the Fishes), the writers bring up the baseline data issue. The EIS substantively responds to both comments in Appendix C, writing that "[c]urrent population estimates are used to evaluate impacts, as those are the populations that would be impacted. Underreporting and poaching are addressed in Section 5.4.3.6 of the EIS. . . . Past cumulative impacts, including changes in reef habitat, were disclosed in Section 5.4.3 of the EIS."

As the environmental court wrote, "[t]he parties disagree on how good the baseline information is, and how to analyze it, but there is no question baseline information is in the RFEIS and was available to BLNR." It also inserted the letter from Drs. Carlson, Pyle, and Kosaki, which highlights the differences in opinion on the data. The question is whether the RFEIS contains sufficient information such that BLNR could make a reasoned decision concerning the relevant environmental factors. Here, the RFEIS contains sufficient information from

both sides of the issue to meet the HEPA content requirements. We therefore conclude that as to cumulative impacts, the RFEIS is sufficient and the environmental court did not err.

### b.    Mitigation measures

HAR § 11-200-17 (now 11-200.1-24) requires an EIS to consider mitigation measures to "avoid, minimize, rectify, or reduce impact."  Plaintiffs argue that the RFEIS failed to "assess the impacts of concentrated commercial take or propose related mitigation measures."  As to the "concentrated commercial take" issue, Plaintiffs essentially argue that the RFEIS fails to account for and plan for the impact of concentrating fish take within certain, targeted areas.  It continues that the RFEIS should establish, within certain targeted areas, specific catch quotas.

We disagree with Plaintiffs.  First, the RFEIS clearly states that "DAR will receive the collection data by zone, and can review any necessary changes when they issue the permits on an annual basis.  In the unlikely event that all collection occurred within a single [aquarium collection] zone, the DAR would be able to evaluate this information."  And in responding to the letter from For the Fishes in which the organization raises this concern the RFEIS continues:

> Given that on the island of Hawaii there is connectivity between adjacent reefs (up to 184 kilometers), with fish from protected FRAs being documented to seed unprotected areas (Christie et al. 2010), it is assumed that the

> population growth occurring in other non-fished areas would seed the collection zone where fishing occurred, and therefore the total allowable catch limits are based upon the entire population, not subpopulations along the WHRFMA coast.

This information was also included in an edit to Section 3.7.1.

The question is whether the RFEIS contains sufficient information such that BLNR could make a reasoned decision concerning the relevant environmental factors. Here, the RFEIS contains information from both sides of the issue. The RFEIS proposes general take limits across all zones of the WHRFMA, but Plaintiffs want take limits within the zones. BLNR had this information in front of it in the RFEIS, and chose to approve the RFEIS without zone limits.

The environmental court's analysis reflects this debate. The court both noted that the concern was raised in the comments to the EIS, and cited an email from Dr. William Walsh. Dr. Walsh argued that a network of fish replenishment areas and marine protected areas had contributed to the sustainable management of the WHRFMA, and, along with the revised EIS's substantial reductions in limits, the WHRFMA would continue to see sustainable levels of fish.

We further note that an EIS "need not be exhaustive to the point of discussing all possible details bearing on the proposed action." Kaleikini, 128 Hawai'i at 67, 283 P.3d at 74.

Just because the RFEIS did not propose localized take limits does not mean the RFEIS is invalid. And, as noted above, BLNR had both sides of this issue before it when deciding on the RFEIS. In its rejection of the initial EIS, BLNR did not mention localized quotas as a reason for rejection.

On this issue, the dissent argues that we are "[a]pplying the 'rule of reason' without regard to HEPA's applicable statutory mandates." Respectfully, as discussed above, we have inquired into whether the RFEIS complied with HAR § 11-200-17(m)'s requirement that an EIS "consider mitigation measures to avoid, minimize, rectify, or reduce impact," and whether it met the rule of reason. It is true that the RFEIS did not have a section entitled "mitigation measures." But substantively, the RFEIS extensively discussed such measures. Notably, the RFEIS includes regular monitoring from DAR, which will receive collection data by zone and can choose whether or not to issue permits on an annual basis after reviewing the data. We therefore conclude that as to cumulative impacts, the RFEIS is sufficient, and accordingly, the environmental court did not err.

### c. Economic impacts

HRS § 343-2 requires disclosure of the "effects of the proposed action on the economic welfare, social welfare, and cultural practices of the community and State." HAR § 11-200-2

defines "environment" to include "all the physical, economic, cultural, and social conditions that exist within the area affected by a proposed action." An EIS must therefore disclose the economic impacts of a proposed action to the "community and State" and not just to the industry itself.

Plaintiffs argue that the "RFEIS limit[ed] its economic analysis to only the commercial interests of and monetary benefits to the aquarium trade." Plaintiffs and members of the public raised this issue in comments to the RFEIS, where they, among other things, cited to a 2021 paper analyzing the costs and benefits of the aquarium trade in Hawai'i — Schaar & Cox, 2021. The Schaar & Cox paper concluded that ending the commercial aquarium trade was the only option that yielded positive economic benefits. The RFEIS responds to this comment, writing that the Schaar & Cox paper did not analyze the preferred alternative, which limited the collection to eight species from the previous forty.

The RFEIS also contains an entire section (4.1) labelled "Socioeconomic Resources" that describes not just revenue that aquarium fishers will bring in, but the number of jobs. The executive summary of the RFEIS also states:

> The Preferred Alternative does not substantially affect the economy but plays an important role as a nearshore fishery in the state. The Preferred Alternative would add an estimated $2.5 to $10 million over the 5-year analysis period (range of $499,416 to $2,022,686 per year), and another five times this value in indirect economic

> benefits. Loss of the fishery would result in the loss of income, tax revenue, and jobs.

### d. Increasing take above historical catch rates

The next alleged deficiency is that the RFEIS fails to analyze the impacts of increasing catch above historical rates. Section 3.7.1 of the RFEIS describes how the eight species were chosen and explains that the catch quotas for each was set based on "either the 20-year historic average catch from the entire WHRFMA fishery (during which the species populations have all been increasing or stable) or to 1% of the 2019 [population estimate study]." Plaintiffs point to the DAR's submittal to BLNR on the RFEIS in which the DAR wrote that for Potter's angelfish and Thompson's surgeonfish, the proposed quotas were "substantially beyond that which has occurred historically." Because of this, the DAR concluded that "it is not possible to assess whether or not past population trends will continue into the future," and "[t]his uncertainty must be carefully considered in any future management decisions regarding the actions proposed in the RFEIS."

Commentors to the EIS noted this issue, and those comments are appended to the RFEIS. In responding, the EIS points to Section 5.4.1.3, which includes a table comparing the density of all eight species in 1999-2000 and 2017-18. In their briefing on appeal, PIJAC emphasized that the final EIS imposed caps on take, limited the number of species from forty to eight

species specifically chosen because they had not experienced population declines in open areas.

BLNR had both sides of this issue before it in the RFEIS. Plaintiffs and the environmental court both rightly acknowledge that, under HRS § 343-5(e), full and adequate environmental review is a "condition precedent" to implementing a proposed action — that is, environmental review ought to be "front-loaded." This ensures that an applicant may not escape public and agency review by, for example, analyzing the environmental impact of their actions once those actions have already begun. Here, the RFEIS includes recent data on trends in fish populations, reasonable explanations for how it decided on each catch limit, and the public comments indicating opposition to the catch limit. Part of the RFEIS includes regular monitoring from the DAR, which will receive collection data by zone. This is a reasonable mitigation measure rather than deference to future decision-makers. The EIS details this in section 3.7.1:

> An annual species-specific individual catch quota would be allotted to each fisher and therefore the total potential catch shown in Table 3-2 would only occur if all seven fishers individually reached their individual catch quota for all eight species. The DAR will receive the collection data by zone, and can review any necessary changes when they issue the permits on an annual basis. In the unlikely event that all collection occurred within a single AQ reporting zone, the DAR would be able to evaluate this information; however, this would effectively leave the rest of the coast completely free of collecting, and essentially create an FRA everywhere else. Given that on the island of Hawaii there is connectivity between adjacent

reefs (up to 184 kilometers), with fish from protected FRAs being documented to seed unprotected areas (Christie et al. 2010, see Section 4.0), it is assumed that the population growth occurring in other non-fished areas would seed the collection zone where fishing occurred, and therefore the total allowable catch limits are based upon the entire population, not subpopulations along the WHRFMA coast. It is noted that the individual catch quotas may be revised (i.e., increased or decreased) over time during the annual permit renewal period based on re-evaluation by the DLNR of each proposed Revised White List species' population status (e.g., new population estimates, new population trend data, etc.). Changes to the individual catch quotas may require additional HEPA review.

### 3. The EIS sufficiently responded to BLNR's initial reasons for non-acceptance

We next analyze the EIS's compliance with HAR

§ 11-200-18 (now HAR § 11-200.1-27) and HAR § 11-200-23. First,

HAR § 11-200-18 requires that the revised final EIS contain:

(1) the draft EIS revised to incorporate substantive comments received during the consultation and review processes;

(2) Reproductions of all letters containing substantive questions, comments, or recommendations and, as applicable, summaries of any scoping meetings held;

(3) A list of persons, organizations, and public agencies commenting on the draft EIS;

(4) The responses of the applicant or proposing agency to each substantive question, comment, or recommendation received in the review and consultation processes[;]

(5) The text of the final EIS which shall be written in a format which allows the reader to easily distinguish changes made to the text of the draft EIS.

The final EIS contains all of this information.

Plaintiffs argue that because some of the required information

is contained in an appendix, the revised EIS is invalid. As

discussed supra, there is no reason why BLNR and the

environmental court cannot rely on appended information. The

48

EIS was revised to incorporate substantive comments as detailed in the executive summary, sections 1.0 to 1.1.3, and Appendix E. Appendix E details what changes and additions were made in every section of the EIS. This is enough to meet the requirements of HAR § 11-200-18(1) and (5). Reproduction of all letters and comments as well as responses to each substantive question, comment, or recommendation are included in Appendix C. We note that this section is voluminous — to require it to be included in the "body" of the EIS would be impracticable and further complicate an already complex document. Appendix C satisfies HAR § 11-200-18(2) and (4). HAR § 11-200(3) is satisfied by Section 6.0 of the EIS, which contains an extensive list of people, organizations, and public agencies that were consulted with for the EIS.

HAR § 11-200-23 governs the acceptability of an EIS. It requires that an EIS be

> evaluated on the basis of whether the final EIS, in its completed form, represents an informational instrument that fulfills the intent and provisions of chapter 343, HRS, and adequately discloses and describes all identifiable environmental impacts and satisfactorily responds to review comments.

HAR § 11-200-23(a).

Plaintiffs' main argument here is about HAR § 11-200-23(e), which reads in full:

> A non-accepted EIS may be revised by a proposing agency or applicant. The revision shall take the form of a revised draft EIS document which shall fully address the inadequacies of the non-accepted EIS and shall completely

49

and thoroughly discuss the changes made. The requirements for filing, distribution, publication of availability for review, acceptance or non-acceptance, and notification and publication of acceptability shall be the same as the requirements prescribed by sections 11-200-20, 11-200-21, 11-200-22, and 11-200-23 for an EIS submitted for acceptance. In addition, the revised draft EIS shall be evaluated for acceptability on the basis of whether it satisfactorily addresses the findings and reasons for non-acceptance.

Plaintiffs argue that the environmental court erred in writing that the rule "ultimately do[es] not impose any higher standard than the 'rule of reason' set forth in Price." As discussed supra, this statement does not fully capture how an EIS should be reviewed. HAR § 11-200-23 has specific requirements — but those requirements were met. As to 11-200-23(e), Plaintiffs' argument is that the revised EIS failed to "fully address the inadequacies of the non-accepted EIS."

BLNR gave fourteen reasons for not accepting the initial EIS. As detailed below, FEIS contained each of the fourteen reasons and its response to each one:

1. In order to properly assess the likely impact of the proposed take of the aquarium fish, the FEIS should contain a reasonably reliable estimate of the amount of future take.

   • This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS which includes species-specific individual catch quotas for participants in the WHRFMA. Therefore, a maximum allowable collection for each species is now provided in Section 5.0.

2. Except for the pāku'iku'i, or Achilles tang, the FEIS does not contain any daily bag limits on any of the "White List" species which the fishers are allowed to take, and there are no annual limits on the take of any species except that the total take of pāku'iku'i would be limited by the fact that only ten permits with a daily limit of five each would be allowed

50

under the proposed action. In addition, there is no scientific basis provided for reducing daily take of pāku'iku'i from ten to five per permit, nor any analysis of the impact of that level of take on the population of pāku'iku'i.

- This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS which includes individual catch quotas for all species on a proposed Revised White List, and collection of Achilles Tang would no longer be permitted in the WHRFMA. While daily limits are not included, the inclusion of annual individual catch quotas addresses this concern by limiting collection within any given year.

3. The existing regulations of the WHRFMA do not contain any daily or annual bag limits other than for the pāku'iku'i, a "slot limit" for yellow tang, and a limit on Kole over 4" long. To project how many fish are likely to be taken, the FEIS relies completely on the historical catch records of these ten fishers for the forty "White List" species. See Tables 5-2 and 5-11. The FEIS concludes that 160,832 fish would be taken annually, based on the maximum number taken by the ten permittees in any year, during the 2000-2017 period. See §5.4.1.5.

- This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS which includes individual catch quotas for the eight species on the proposed Revised White List. While daily limits are not included, annual individual catch quotas addresses this concern by limiting collection within any given year.

4. It appears that no more than 8 of the 10 fishers were active in any previous year. See Table 4-2. It seems likely that all ten fishers will be active, given they had sufficient interest in the permits to fund the EIS, and that they will have a monopoly on the use of fine-mesh nets to collect fish in the WHRFMA.

- This concern was determined by the Environmental Council to be arbitrary and capricious.

5. The FEIS has no information about the level of effort of these 10 fishers in prior years, i.e., whether they collected 100, 200, or 300 days a year, for example, and the amount of time spent collecting. It is possible that they could significantly increase their collection efforts and total take.

- This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS, which implements species-specific individual catch quotas for each of the requested permits.

6. The fishers could also or alternatively change what species they target for collection and increase the impact on some species.

   - This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS, which includes a proposed Revised White List of only eight species and individual catch quotas for each of those species.

7. The data in the FEIS show that these ten fishers take some species at a very different rate than the fishery as a whole. For example, although the percentage taken of all species by the ten in the WHRFMA varies from a low of 7.0% in FY2000 (when only two were active) to 46.4% in FY2017 (Table 5-2), their percentage of take of individual species, at least in certain years, has been much higher. Table 5-11 gives the maximum catch in any one year for each of the "White List" species, and the maximum catch in any one year by the ten. The ten fishers took 83.7% of the lei triggerfish (252/301), 95.5% of the milletseed butterfly fish (402/421), and 89.2% of the Fisher's angelfish (257/288), and 54.6% of the kole (23,014/42,122.) On the other hand, they took only 9.1% of the ornate wrasse (1130/12,445). This demonstrates that collectors can, and do, selectively target some species more than others. (It is not clear whether the maximum year given for all collectors is the same year as that given for the maximum by the ten fishers. The basic point made here is valid in either case, however.)

   - This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS, which includes a proposed Revised White List of only eight species and individual catch quotas for each of those species.

8. In order to assess the likely impact of the take, the FEIS should adequately analyze the sustainable level of take. The FEIS relies on Ochavillo and Hodgson (2006) for the proposition that 5-25% of a population is a sustainable level for annual take. The FEIS has an inadequate justification for the reliance on this publication as the best available science. The FEIS does not provide data for nor statistically analyze the sustainability of that level of take for each type of fish, given each fish species' life span, population size, reproductivity rates and age at first reproduction.

- This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS, which includes a proposed Revised White List of only eight species, all of which have shown a stable or increasing population size in the WHRFMA over the last 20 years. No species with declining populations will be allowed to be collected in the WHRFMA.

9. In §5.4.1.5, the FEIS uses Table 5-11 to compare the take of various species to the CREP population estimates, to show that they are well below the claimed 5-25% sustainable level. In Table 4-5, however, the harvest/population ratios of four or five species (depending on the year) in the West Hawaiʻi open areas at 30'-60' depth exceeded 5% for several species, and are as high as 39.67% for the pakuʻikuʻi in 2017-2018. The West Hawaiʻi open area population estimates may be more relevant than the island-wide CREP data.

   - This concern is addressed by the new Preferred Alternative which has been added to Section 3.7 of the Revised FEIS, which includes a proposed Revised White List of only eight species, all of which have shown an increase in population size in the WHRFMA over the last 20 years. In addition, Section 5.4.1 has been revised to include an analysis of impacts based on Pacific Islands Fisheries Science Center Ecosystem Sciences Division (PIFSC-ESD; formerly Coral Reef Ecosystems Program [CREP]) population estimates within the WHRFMA, WHAP WHRMFA population estimates, WHAP Open Area population estimates, and impacts specific to East Hawaiʻi.

10. The FEIS has an inadequate discussion of the role of herbivores. Many of the "White List" species are herbivores.

    - This concern has been addressed by adding detail on herbivores to Section 5.4.1 of the Revised FEIS.

11. The FEIS does not adequately discuss relevant negative findings, for example, the reduced numbers of aquarium fish at collection sites found by Tissot and Hallacher (2003). The FEIS need not agree or disprove the negative findings, but it should discuss them.

    - This concern was determined by the Environmental Council to be arbitrary and capricious.

53

12. The extreme threat of climate change on our reefs warrants extreme caution in reviewing activities that may affect them. The FEIS should further discuss potential effects of present and future levels of climate change including ocean warming, ocean acidification, coral bleaching, extreme storms, and resulting reef destruction and algae growth, and the potential for mitigating harm (i.e., further regulation) if the proposed fishery has unanticipated or greater negative effects with climate change.

   • This concern has been addressed through edits to Section 5.4.3.

13. The FEIS failed to sufficiently consider cultural impacts. The FEIS improperly concluded that the impacts to cultural resources under any of the proposed alternatives would be less than significant based on the flawed premise that cultural impacts would only occur if the proposed action would cause a significant decline in the population of a White List Species considered to be a cultural resource. A number of testimonies expressed misgivings from a cultural standpoint with the proposed activity itself, regardless of impact on resources, and this was not adequately considered in concluding no significant impact.

   • This concern has been addressed through edits to Section 5.3.

14. The FEIS does not adequately discuss the effect of illegal aquarium fishing on the numbers of projected sustainable take of fish species.

   • This concern was determined by the Environmental Council to be arbitrary and capricious. The Applicant does not support or condone poaching or any infractions of the law.

As to Reasons 1-3, 5-10, and 12-13, the EIS is clearly responsive: it notes edits that it made to the EIS in response to this concern. In conjunction with Appendix E, where the EIS provides more detail to its edits, we conclude that the document provides enough information for BLNR to make a reasoned decision.

54

As to Reasons 4, 11, and 14, the EIS states that the concerns were determined to be arbitrary and capricious by the environmental council. But the environmental council's decision was vacated by the environmental court several months before PIJAC submitted its revised EIS. The environmental court, however, only reversed as to the council's finding that Reason 11 was arbitrary and capricious. It is therefore reasonable that as to Reasons 4 and 14, the revised FEIS would not be responsive — the environmental court did not vacate the environmental council's decision as to those two Reasons. We therefore only discuss whether PIJAC appropriately responded to Reason 11. Reason 11 for nonacceptance was:

> The FEIS does not adequately discuss relevant negative findings, for example, the reduced numbers of aquarium fish at collection sites found by Tissot and Hallacher (2003). The FEIS need not agree or disprove the negative findings, but it should discuss them.

Plaintiffs and the dissent argue that the RFEIS does not adequately respond to this reason for non-acceptance. Respectfully, we disagree. We do not read Reason 11 to require that the revised EIS address Tissot and Hallacher. Rather, we read this Reason to describe the Tissot and Hallacher paper as just one example of negative findings that the RFEIS should engage with. As the environmental court recognized, the RFEIS discloses and engages with negative findings extensively. Further, the EIS does discuss the Tissot and Hallacher article,

noting its existence several times throughout the document — for example, in section 5.4.2.3.  The RFEIS also responds to the science of the Tissot and Hallacher article in the appendix, writing "[t]he collection that was occurring during the Tissot and Hallacher study was before the establishment of the WHRFMA, including the implementation of the current White List [of eight species], and therefore the impacts on fish populations were not as relevant as more recent data from the DAR focused on the time period since the WHRFMA went into effect (i.e., the time period from 1999/2000-2017/2018)."  Finally, Tissot and Hallacher themselves signed onto a letter urging BLNR to accept the RFEIS, though we recognize this point has only limited force because the letter is not in the RFEIS.

In sum, we conclude that the environmental court did not err in entering judgment for the State and PIJAC.

## V.    CONCLUSION

Accordingly, we affirm the environmental court's (1) January 2, 2022 "Order Denying Defendants' Motion to Dismiss Complaint Filed July 13, 2021"; (2) August 16, 2022 "Ruling on Plaintiffs' MSJ"; (3) "Order Denying [072] Plaintiffs Willie Kaupiko, Ka'imi Kaupiko, Mike Nakachi, For the Fishes, Center for Biological Diversity, and Kai Palaoa's Motion for Summary

Judgment Filed February 18, 2022"; and (4) September 12, 2022

Final Judgment.

Mahesh Cleveland,                         /s/ Mark E. Recktenwald
Isaac H. Moriwake,
Kylie W. Wager Cruz                       /s/ Todd W. Eddins
for plaintiff-appellants/
cross-appellees                           /s/ John M. Tonaki

Melissa D. Goldman,                       /s/ Shanlyn A.S. Park
(Julie H. China and
Daniel A. Morris,
on the briefs),
for defendants-appellees/
cross-appellants

Geoffrey M. Davis,
for defendant-intervenor-
appellee/cross-appellees

